978 So.2d 967 (2007)
STATE of Louisiana
v.
Brandon A. VINCENT.
No. 07-KA-239.
Court of Appeal of Louisiana, Fifth Circuit.
December 27, 2007.
*969 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Thomas J. Butler, Roger W. Jordan, Jr., Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Juan C. Labadie, Attorney at Law, Gretna, Louisiana, for Defendant/Appellant.
Panel composed of Judges MARION F. EDWARDS, SUSAN M. CHEHARDY, and GREG G. GUIDRY.
MARION F. EDWARDS, Judge.
Defendant/appellant, Brandon A. Vincent ("Vincent"), appeals his conviction of two counts of oral sexual battery of two different juveniles in violation of LSA-R.S. 14:43.3. Following his conviction, Vincent was sentenced to eight years on each count to run concurrently with each other. We affirm the convictions and remand with instructions.
The juvenile victim, M, testified at trial that, in 2003, she spent weekends at the home of her aunt, Helen, and that Vincent, her cousin, began living there. During those visits, M performed oral sex on Vincent approximately ten times, beginning in the summer of 2003, before she started fifth grade when she was twelve years old. Vincent was eighteen at the time. M testified that the incidents continued to occur during her fifth-grade year.
M described the first incident as follows: she was sitting in the front room watching television when Vincent asked her to "come here," into his room. When she complied, he asked her to give him a "blow job." M testified that he sat down and took his penis out of his pants, and that she then got on her knees and put his penis in her mouth for five or ten minutes. M indicated that her aunt was not there at the time.
Later on, M asked Vincent if he would introduce her to his girlfriend's brother, Michael, and he said he would. Prior to each incident, Vincent would say, "If you *970 give me a blow job I'll hook you up with Michael."
M testified that her aunt was never home during these incidents except one time. On that occasion, M's aunt was sitting in the kitchen drinking coffee when Vincent called M to come into his room, asking for a "blow job" and promising an introduction to Michael. All except one incident, which occurred in the front room, took place in Vincent's bedroom.
M said that the last time a similar incident occurred with Vincent was at her own house when Vincent came over and her family was not at home. He again asked her to give him a "blow job," and she did. Afterwards, M stopped going to her aunt's house because she did not want the incidents to happen anymore. She explained that the incidents made her feel like "nothing" and "worthless," and she blamed herself for them at the time. M finally told Shannon, a counselor at school, about the events because she kept having nightmares. M also told Shannon that a similar incident happened to her friend, F. M stated that she and F went to Helen's house to ask Helen if M could spend the night at F's home. M and F were sitting on the sofa in the front room when Vincent came in and pulled F into his bedroom, locking the door. M started banging on the door trying to get in. She looked through a hole in the door and saw that Vincent had F "pinned" to the ground. M finally gave up and went and sat down on the sofa and watched television.
M explained that F eventually came out of the room and told her what happened. M then told F what Vincent had done to her, and the girls promised each other at that time that they would never tell anybody what had happened. F was upset and didn't want her family to find out what had happened.
M then testified that, on another occasion, she and F were at her aunt's house when Vincent called F into his bedroom. She came out a few minutes later and said that Vincent wanted M. M went into the bedroom, and Vincent asked her for another "blow."
F testified that in August of 2003, she and M went to Helen's house to see if M could spend the night at F's house. Helen told them to wait because she had to go to the store to pick up her sister. After Helen left, F was sitting on the sofa in the living room watching television, and M was in Vincent's room. F testified that Vincent then came into the room and asked her to come into his room. F refused, so Vincent pulled her into the bedroom, pushing M out. Vincent locked the door, and M started banging on the door and cursing. At first, F thought Vincent was "playing," but when she asked to leave, he refused. Vincent then asked her if she wanted to "suck his d . . ." and she said "no." After she refused, he got on top of her and put his penis into her mouth, put his hand on top of her head and moved her head back and forth. When Helen returned home, Vincent stopped and F got up, pushing F out the door and telling her not to tell anyone or "something else might happen." F was scared during the incident and noted that Vincent had pictures of nude women on his wall.
Shannon Cumming, a teacher and school "prevention specialist," testified that M confided to her that her eighteen-year-old cousin was making her give him "blow jobs." M told her it happened when her aunt left the house, and that it had also happened to one of her friends, F. M appeared to be very upset and embarrassed.
Dr. Scott Benton ("Dr. Benton"), who was qualified as an expert in the field of forensic pediatric medicine, testified that *971 Dr. Marymer Perales ("Dr. Perales"), his senior fellow, interviewed and examined M on February 20, 2004. The interview was taped. Dr. Benton testified that there were no physical findings, which was not inconsistent with the history M gave of penile-oral penetration. The delay in reporting the incident was not unusual.
Dr. Ellie Wetsman ("Dr. Wetsman"), who was qualified as an expert in the field of pediatric forensic medicine, testified that she interviewed F on April 28, 2004. Dr. Wetsman also examined F that day, but there were no physical findings. F related that Vincent pulled her into his room and made her put her mouth on his private area. Vincent told her not to tell anybody or something else might happen, "probably kill me or rape me." She explained that findings were not expected, since the incident had occurred the previous August. She testified that it was common for children to delay reporting incidents of abuse for many reasons: the child does not know the incidents are wrong, the child is ashamed or embarrassed, the perpetrator tells the child that it is the child's fault and the child is to blame and that the child will be punished, or the perpetrator may bribe the child not to tell or threaten them.
Omalee Gordon ("Gordon") testified that she was employed by the Gretna Police Department and assigned to the Jefferson Children's Advocacy Center as a forensic interviewer. Gordon interviewed both victims, and both interviews were taped and played for the jury.
After the State rested, the defense called Helen as a witness. Helen testified that she recalled the time M and F came over in August of 2003 to ask if M could spend the night at F's house. Helen insisted that Vincent was not there when M and F got there, and she did not recall his being there at all that day. Helen also insisted that there never was a time when she left M and F alone to run errands, and that she never left M alone at her house, as she did not believe in leaving kids under 16 years of age on their own. However, she admitted that Vincent was at her house one time when M and F were there.
Shelly, the girlfriend of M's brother, testified that, soon after everything came out, she overheard M telling her mother, stepfather, and brother that she was lying, but could not change her story now and would not anyway. Shelly also overheard something regarding the district attorney, Vincent, and a meeting. Shelly testified that she did not come forward sooner because she did not want anybody to "hate" her, and she did not want to hurt anybody. She then stated that Vincent's mother had asked her to come to court and testify.
On appeal, Vincent first argues that certain portions of the record are missing, and he is, thus, deprived of his constitutional right of appeal. He contends that argument of counsel was omitted from the transcript of a hearing on the State's Motion in Limine, which argument involved a crucial part of his defense, thereby causing him prejudice. According to Vincent, the lack of this portion of the transcript prevented him from effectively challenging the ruling on the Motion in Limine. Vincent also contends that he was prejudiced because a bench conference held during defense counsel's opening statement was missing from the record. While Vincent also notes that voir dire was not transcribed, he does not allege any specific prejudice as a result of that omission.
La. Const. art. I, § 19 guarantees defendants a right of appeal "based upon a complete record of all the evidence upon which the judgment is based." LSA-C.Cr.P. art. 843 requires the recordation of all of the proceedings, including the examination of prospective jurors, the testimony *972 of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel.
Although the Louisiana Supreme Court has found reversible error when material portions of the trial record were unavailable or incomplete, "[a] slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal [will] not cause . . ." reversal of a defendant's conviction.[1] An incomplete record may be adequate for appellate review.[2] While material omissions from the proceeding bearing on the merits of the appeal require reversal, a defendant will not be entitled to relief on the basis of an incomplete record absent a showing that he was prejudiced by the missing portions of the record.[3] The determination of whether the omissions are material must be made on a case by case basis.[4]
Vincent argues that the evidence was legally insufficient to support the verdicts because the trial testimony was conflicting and contradicting. He contends that the most glaring and irreconcilable contradiction in the testimony was the victims' accounts of the sexual assault that took place at Helen's house when both victims were there. Vincent's argument addresses the credibility of the victims. Vincent is correct in that there were some inconsistencies in their testimony. The trial court noted this in denying a Motion for New Trial but found that the victims were very young and that juries "don't hold them to the accountability of being perfect."
There are some inconsistencies in the testimony. For example, F testified that the sexual battery took place once; M stated that it happened to F twice. M's version of the sequence of events differed from F's. In her recorded statement, F stated that M was in the room with Vincent first, then he pushed her out. F testified that she was in Vincent's bedroom on that occasion for thirty minutes; however, M thought that F was in there five or ten minutes. F testified that Helen came home while she was still with Vincent; M testified that Vincent called her into the room after he was finished with F. M testified that she and F had spent the night at Helen's house on that occasion, but F testified that, after the incident, she and M walked to F's house that evening.
It is well established that the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the state fails to introduce physical evidence to substantiate the commission of the offense.[5] The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness.[6] Where there is conflicting testimony about factual matters, the resolution of which depends on a determination of credibility of the witnesses, this is a *973 matter of the weight of the evidence, not its sufficiency, and the credibility of witnesses will not be reweighed on appeal.[7] "[T]he Jackson standard does not serve as a vehicle for a reviewing court to second-guess the rational credibility determinations of the fact finder at trial."[8]
Furthermore,
[w]hen a witness is impeached, this simply means the jury, as the trier of fact, is presented with evidence which it could consider and weigh in determining the credibility, or believability, of a witness. Simply because the witness may have been impeached by prior inconsistent statements does not mean that the jury is prohibited from believing anything said by the witness. The inconsistencies in the witness's statements are one of any number of factors the jury weighs in determining whether or not to believe a witness's trial testimony.[9]
Here the jury chose to believe the victims. They had the opportunity to hear and consider all of the testimony, and defense counsel was able to effectively cross-examine the witnesses. Further, the major inconsistencies were detailed in the closing argument. The victims were quite consistent in their testimony as to what Vincent did to them. We have no reason to second-guess the credibility finding. The jury could have reasonably determined, based on all the evidence, that Vincent committed the offenses with which he was charged and that the young victims simply had trouble remembering some of the minor details of the incidents. Viewing the evidence in the light most favorable to the State, we find that a rational juror could have found that the State proved the essential elements of the crimes of oral sexual battery beyond a reasonable doubt, thus satisfying the Jackson[10] standard.
This assignment of error is without merit.
Vincent also complains that the transcript of the trial record is so defective as to deprive him of his constitutional right of appeal. He contends that the omitted arguments of counsel during a hearing on the State's Motion in Limine involved a crucial part of his defense, thereby causing him prejudice.
The record reflects that, on March 29, 2005, the State filed a written Motion in Limine asking the trial court to prohibit the defense from introducing or eliciting inadmissible character evidence of the victims pursuant to LSA-C.E. art. 412. At the hearing on the motion on May 2, 2005, the transcript reveals that trial judge granted the State's request to exclude testimony of the prior rape of one of the victims. The arguments of counsel were not transcribed. The trial judge commented that the rape shield statute was meant to protect a victim's privacy and added that the fact that she was the victim in another case was irrelevant. Defense counsel noted his objection to the trial judge's ruling.
On the first day of trial, defense counsel asked the trial judge to reconsider her prior ruling on the State's Motion in Limine, arguing that evidence of the prior rape did not fall under LSA-C.E. art. 412. The argument was urged in connection with a separate defense motion, filed on *974 the morning of trial, involving psychiatric treatment of M. In argument, the defense clearly stated that M was the rape victim and that psychiatric testimony related to that rape was related to a defense theory (M's "unresolved anger" over the earlier incident). Counsel urged that it was extremely critical to the defense that it be allowed to introduce evidence of the prior rape, not because it involved sex, but because it involved violence. However, he responded negatively when asked if he had case law to support his position. The prosecutor countered that LSA-C.E. art. 412 was applicable to this situation. After these arguments of counsel, the trial judge denied the motion, apparently refusing to reconsider her earlier ruling.
Defense counsel's argument regarding the Motion in Limine is contained in that portion of the record. Vincent's motion for disclosure of M's past psychiatric history also states that this information would have a direct bearing on her credibility. Thus, the record contains sufficient information for this Court to ascertain the defense's argument and review the trial judge's ruling had it been challenged on appeal. Omission of the prior argument is immaterial to an adequate review of this issue.
Vincent also contends that he was prejudiced because a bench conference held during defense counsel's opening statement was missing from the record. Regarding the bench conference, the record reflects that the prosecutor, in his opening statement, told the jury that the incident with Vincent was F's first sexual experience, and that M's abuse started at the hands of Vincent in the summer of 2003. Defense counsel sought to counter the State's assertion in his opening statement by telling the jury that this was not F's first sexual experience. After the State objected, a bench conference was held but not transcribed. Following the bench conference, the trial judge admonished the jury by telling them that opening statements were not evidence and to disregard that the prosecutor said that this was F's first sexual experience. She also stated that, until there was testimony from the witness stand, there was no evidence that this was or was not F's first sexual experience.
Neither LSA-C.Cr.P. art. 843 nor La. Const. art. I, § 19 require recordation of bench conferences, and the Louisiana Supreme Court has not articulated such rule.[11] Lack of recordation of arguments heard at the bench, alone, is not error. Rather, it is the court's ability to review and the demonstration of prejudice that are at issue.[12]
Here, the prosecutor stated his objection and the basis therefor prior to approaching the bench. Vincent's trial counsel certainly has knowledge of his own arguments made at the bench. Had the ruling by the trial judge been challenged on appeal, we could review its correctness as the jury was admonished to disregard any statements regarding F's sexual experience. Vincent has failed to demonstrate any reasonable likelihood that he suffered prejudice resulting from the missing arguments.
Finally, Vincent argues that a letter from the court reporter dated March 30, 2007 advising the Appeals Department that the transcript had not been lodged supports his position that the transcript of the trial record is so defective that it deprived *975 him of his constitutional right of appeal. The March 30, 2007 letter from the court reporter to the Twenty-Fourth Judicial District Court Appeals Department shows that the transcript dated March 29, 2005 was not lodged because it was "lost to Hurricane Katrina." Defendant raises no issues on appeal that involve anything that occurred on March 29, 2005. There is no demonstration of any prejudice to Vincent.
This assignment of error is without merit.
In his third assignment of error, Vincent contends that his conviction should be reversed because the State's rebuttal argument was improper, in that it shifted the burden of proof to the defense by arguing that Vincent had failed to prove the victims had lied.
The record reflects that defendant did not object to the prosecutor's rebuttal argument at any time. LSA-C.Cr.P. art. 841(A) provides that "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." There are limited, judicially created exceptions to the contemporaneous objection rule.[13] Statements made during a prosecutor's closing argument may be considered on appeal absent an objection at trial if the remarks made were "`so extremely inflammatory and prejudicial' . . . that allowing the verdict to stand would `seriously affect the fairness, integrity or public reputation of judicial proceedings.'"[14]
The record indicates that the prosecutor did not make a closing argument, but rather, reserved his time for rebuttal. Therefore, defense counsel gave his closing argument first. In his closing argument, defense counsel pointed out the inconsistencies and contradictions in the testimony and on the videotape of M being interviewed at the Children's Advocacy Center. Afterwards, the prosecutor presented his rebuttal argument. In his argument, the prosecutor remarked that the one "glaring" problem with Vincent's case was that nobody came into the courtroom to provide a motive or reasons as to why M and F would lie about being sexually abused. The prosecutor argued that it was unlikely that two thirteen-year-old girls would fabricate such a conspiracy and then lie to their school counselors, parents, police officers, the Children's Advocacy Center, Children's Hospital, and the court for two years. He pointed out that there were many consistencies in M's story, including the location of the incidents, the positions she and Vincent were in during the incidents, and the type of sex they engaged in. The prosecutor urged that children lie to get out of trouble, not to be "dragged" through the court system and forced to talk about the intimate details of their lives. He explained the inconsistencies in the testimony by stating that M and F were different people and, therefore, they had different perspectives on singular events. The prosecutor contended the jury would have to find that the victims conspired to make up the story.
The scope of closing argument shall be "confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case. The argument shall not appeal to prejudice. The state's rebuttal shall be confined to answering the argument of the defendant." LSA-C.Cr.P. art. 774. Nevertheless, a *976 conviction is not reversed due to improper remarks during closing argument unless the reviewing court is thoroughly convinced that the remarks influenced the jury and contributed to the verdict.[15] Further, a prosecutor retains "considerable latitude" when making closing arguments.[16]
In the present case, the defense pointed out during closing argument that there were inconsistencies and contradictions in the victims' testimony, implying that the jury should not believe the victims because they were lying. The prosecutor's argument in rebuttal, that no evidence was presented to show why the victims would have lied, was proper because it was in response to those remarks.[17] The State did not shift the burden of proof; rather, it just pointed out that the victims told the truth.
This assignment of error is without merit.
Finally, Vincent argues that the trial court erred in denying his motion for new trial. He contends that, based on the totality of the circumstancesthe defects in the transcript, the insufficient evidence, and the State's improper rebuttal argument, the motion should have been granted. The combined effect of assignments of error, none of which warrant reversal, do not deprive a defendant of his right to a constitutionally fair trial.[18] Because all of Vincent's other assignments have been fully addressed herein, he presents nothing new for this Court to review by this assignment of error.
On error patent review, we find the transcript and the commitment are inconsistent. The transcript indicates that the trial judge sentenced Vincent to eight years in parish prison on both counts to run concurrently with each other, while the commitment reflects that the trial judge ordered the two sentences to run concurrently with each as well as with the sentences in case numbers 06-705 and 06-706. Because the transcript prevails, the case is remanded to the trial court in order for it to correct the commitment to conform to the transcript. The clerk of the district court is further ordered to transmit the original of the corrected commitment to the officer in charge of the institution to which Vincent has been sentenced. In addition, the trial judge failed to impose the sentences without benefit of parole, probation, or suspension of sentence pursuant to LSA-R.S. 14:43.3(C). However, no corrective action is necessary as the sentence is deemed to contain those restrictions. LSA-R.S. 15:301.1.
The record reflects that Vincent was given written notification of the sex offender registration requirements. However, LSA-R.S. 15:542.1 provides for an additional registration process for child predators, and Vincent fits the definition under LSA-R.S. 15:541(3). Therefore, the trial judge is ordered to provide written notice of both the general sex offender and the child predator registration provisions.
Accordingly, for the reasons assigned herein, we hereby affirm Vincent's convictions. The case is remanded with instructions in keeping with this opinion.
*977 CONVICTIONS AFFIRMED; REMANDED WITH INSTRUCTIONS.
NOTES
[1] State v. Blank, XXXX-XXXX (La.4/11/07), 955 So.2d 90 (citing State v. Ford, 338 So.2d 107, 110 (La.1976)).
[2] State v. Castleberry, XXXX-XXXX (La.4/13/99), 758 So.2d 749, 773, cert. denied, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999).
[3] Id.; State v. Draughn, XXXX-XXXX (La. 1/17/07), 950 So.2d 583.
[4] State v. Boatner, XXXX-XXXX (La. 12/3/03), 861 So.2d 149 (La.2003).
[5] State v. Hotoph, 99-243 (La.App. 5 Cir. 11/10/99), 750 So.2d 1036, 1045, writ denied, 99-3477 (La.6/30/00), 765 So.2d 1062, writ denied, 00-0150 (La.6/30/00), 765 So.2d 1066; State v. Brown 01-41 (La.App. 5 Cir. 5/30/01), 788 So.2d 694.
[6] Id.
[7] Id.
[8] State v. Brown, supra (citing State v. Juluke, 98-0341 (La. 1/8/99), 725 So.2d 1291).
[9] State v. Hotoph, supra; State v. Brown, supra.
[10] Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).
[11] See, State v. Hoffman, XXXX-XXXX (La.4/11/00), 768 So.2d 542.
[12] State v. Clark, 93-903 (La.App. 3 Cir. 3/16/94), 638 So.2d 225; also see, State v. Boatner, supra.
[13] State v. Hayes, 364 So.2d 923 (La.1978); State v. Rochon, 98-717 (La.App. 5 Cir. 3/10/99), 733 So.2d 624.
[14] Id.
[15] State v. Fernandez, 03-987 (La.App. 5 Cir. 12/30/03), 864 So.2d 764; State v. Jackson, 04-293 (La.App. 5 Cir. 7/27/04) 880 So.2d 69, writ denied, XXXX-XXXX (La.5/6/05), 901 So.2d 1094.
[16] State v. Fernandez, supra.
[17] See, e.g., State v. Ledet, 00-1103 (La.App. 5 Cir. 7/30/01), 792 So.2d 160, 176, writ denied, 01-2451 (La.9/30/02), 825 So.2d 1185.
[18] State v. Rochon, 98-717 (La.App. 5 Cir. 3/10/99), 733 So.2d 624.